Our final case for argument is 23-1870, Buford v. Treasury. Ms. Campbell, please proceed. May it please the Court? I'm Leticia Campbell, on behalf of Petitioner Mario Buford. The issues before the Court are whether the agency... Can you speak up a little bit? I know the microphone's not good, but... Yeah. If you just speak a little bit louder, because we can hear you, but I don't think they can hear you. Oh, okay. Sorry about that. The four issues before the Court are whether the agency proved by substantial evidence that Mr. Buford disregarded a lawful order to submit to a psychiatric examination, whether Mr. Buford was denied due process when the agency didn't provide him with all the materials their deciding official relied upon when it removed him, when it sustained the charge and proposed his removal, actually upheld his removal from federal service, whether the administrative judge abused his discretion when he failed to comply with the objective evidence standard that was articulated by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624, and whether the removal exceeds the maximum reasonable penalty in the case. And I want to start with the due process issue, because that's the most significant. The law is clear that tenured federal employees are entitled to due process, and that's at Stone v. FDIC 179 F3D 1368-1375. And due process requires the agency to give the employee notice of the charges and the evidence that was used against them to support the charges and opportunity to respond to each of those. So are you arguing that there were some reports that are applicable here? Is that part of your due process argument? So there's not just reports, because the law is clear that it doesn't matter what the category of documents are that were withheld. The employee is just entitled to all of the evidence, whatever it is, that was used against him. So the deciding official. Okay, so what I'm asking then is, are you arguing that there was some evidence that was withheld? Yes. And so what is your basis for contending that there was some evidence that was withheld? Yes, Your Honor. The deciding official, Mr. Batford, testified that he reviewed a few files that were over a couple of hundred pages. So I look at that testimony and it seemed pretty vague. Can you maybe explain what you're relying on in particular to indicate that there really were those files in existence in this particular case as opposed to maybe just something that he generally thought happened in various cases? Well, he didn't refer to various cases. He referred to Mr. Buford's case specifically. Well, maybe we should just look at the testimony. Maybe that would be the easiest way. Can you talk me through that testimony? Yes. So let's look at Appendix 161. Okay. Starting at line 5, and I asked him that he reviewed the materials relied upon. He said, yes, that's correct. I asked him what those were. He said, quote, a couple of reports in there, the 2015 letter from Mr. Arrow. I skipped down. The proposal letter was in there. I asked him about the couple of reports. He said he's trying to remember if it was a TIGDA report. And at the bottom, I asked him how many pages were in the files that he received. Well, before we get there, Your Honor, he said he can't remember if it was a TIGDA report or not. But I asked him how many pages were in the materials that he relied upon, and he said, quote, most of those files were over a couple of hundred pages, end quote. So you skipped over where it says I don't recall. I have to go back and look, right? Yeah, but he didn't say he didn't recall if he reviewed a couple of hundred pages. He said I asked him what kind of reports did he review, and he said at line 17, quote, I'm trying to remember if there was a TIGDA report in there or not. I can't remember, end quote. And that's when I asked him, well, how large were the pages that you reviewed in the materials relied upon? And he said most of the files were over a couple of hundred pages. So when you look at the agency's table of contents for their agency files, they identified the materials relied upon as consisting of four pages, pages 10 to 13 of their agency, or part 15 of their agency file. So regardless of what the documents were that they reviewed, a couple of hundred pages is significantly more than the four that the agency indicated that they provided to Mr. Kiefer. But how do we know? I mean, my recollection was that the employee sent hundreds of pages to the deciding agency. That is correct. How do we know that isn't the hundreds of pages he's talking about? And if it's coming from the employee, then they don't have to send it right back to them, do they? That's correct. But if you look at page 162 of the appendix, which continues Mr. Batdorf's testimony, at the top my question is, quote, and who provided those files to you, end quote. And Mr. Batdorf said, quote, it probably would have been our L.R. specialist, end quote. And I asked him, does he recall if it was the L.R. specialist? And he says, I do not recall. What's an L.R. specialist? Labor relations. Well, isn't that the person that the employee might have sent a bunch of documents to? In the testimony, Mr. Batdorf didn't. Usually when we have these ex parte cases, there's a specific piece of information that the deciding official has called out as affecting his testimony that the employee was never given a chance to respond to. In some cases, they've talked to another employee at the office that worked with his employee and they never told the removed employee about that. Or there was something specific that was in a file that they called out in their deciding official as important to their decision on removal or penalty. Is there anything in the deciding official's determination that suggests he relied on a specific piece of information that your client didn't have? Yes, his testimony that he reviewed a couple of times. No, his decision. Because that's what's on the review. He said he got the charges, he reviewed stuff, and then he gave the reasons for why he was sustaining them, right? Yes. Did he add anything in to that decision that specifically identified something that the employee already had gotten? Well, he didn't specifically identify it because he said he couldn't remember, but the case law doesn't say that the manager has to say exactly what it was. The case law clears that. The board made a fact finding here that there was nothing specific enough to be material that would rise to a due process violation. And you can't identify anything. It's not that it's a due process violation if there were things that weren't turned over. It's if they weren't turned over and they were material and they were relied upon to make the removal decision. Well, I think there's no question that they were relied upon because the deciding official asked him what he reviewed and the materials relied upon. He said a couple of hundred pages. Isn't there a difference between reviewing and relying on? Well, you can certainly rely on things that you review. There's no question that it wasn't. On counsel, page 164 and 165, continuing the same testimony, you asked him whether or not it was Mr. Jones, it was a specialist. Is that what you're saying? Is that right? Correct? Are they related to specialists? Got it. Anyone else know how they know of? Then you say you testified earlier that when you reviewed the documentation that Mr. Beasley provided to you, that was somewhere between 150 to 170 exhibits. And yes, I do. Can you tell me about that? So then it seems possible that the board below could have understood his statement about several hundred pages as being the several hundred pages provided by Mr. Cooper through his labor relations specialist. That's the problem. I don't see any evidence that there exists. I don't know what it is, but TIGTA reported anywhere. There doesn't seem to be any evidence that there is one or that it was relied on by him. Right. But the agency didn't turn that over, and that's specifically the problem. See, they didn't turn it over. There's a proof there is one. Well, there's no dispute that Mr. Baddour said that he reviewed a couple hundred pages, and there's also no dispute that it wasn't provided to Mr. Buford. And there's also no dispute that when I asked him who provided him with those couple hundred pages, he did not identify Mr. Buford. And when I asked him about 164 and 165, it says that he reviewed – Well, wait. But who provided them? The labor relations specialist. And then when you go two pages further, in the same testimony, he refers to what the labor relations specialist, having given him, was over 150 to 170 exhibits. Why doesn't that tie it all up in at least for purposes, our purposes, which are reviewing under abuse of discretion what the merit system protection bill did? I mean, why isn't that sufficient? I understand your argument about how that kind of could have interpreted those things differently. But I think Your Honor's reading of that testimony is inaccurate, especially on page 165 with line 6. It doesn't say anywhere that the labor and employee relations specialist provided Mr. Buford's written reply to the labor and employee relations specialist or Mr. Baddour. In fact, Mr. Baddour testified that Mr. Buford provided his written reply. Mr. Buford testified that he provided his written reply directly to Mr. Dorsey, and then he received it from Mr. Baddour. But I think if Mr. Baddour believed the documents were from Mr. Buford, he would have said that, but he didn't say that. He said he thought it was from the labor and employee relations specialist. I think fundamentally, though, I don't think the admissions that you think you got are quite as clean as you're describing them. I feel like Chief Judge Gore explained one medium. I understand that you have a different viewpoint, but maybe you should move on to your next argument. Okay. And can I say one thing before I do move on? I think we should read the deciding official's testimony for what he actually said, because he testified to his experience rather than some other unexpressed meaning in the record. So my next point I want to move on to, and they kind of go together, is whether the agency proved by substantial evidence that Mr. Buford disregarded a lawful order to submit to a psychiatric examination and to prove the charge of whether or not one violated a lawful order is, at first, the instruction given had to have been proper, and then the person had to have not failed. And our argument here is that the instruction for him to submit to a psychiatric examination was not proper. You agreed he refused to submit. I'm sorry? You agreed he refused to submit. Yes. Your only argument is that it shouldn't have been given because it wasn't lawful. Right. And so the agency issued that order under 5 CFR Section 339.301, which allows them to require a medical examination for somebody in this instance, but it has to be based on objective evidence. And they essentially wanted Mr. Buford to submit to the psychiatric examination because he kept complaining to them about suspicious activity on his computer. But it wasn't just the figment of his imagination. He showed them screenshots of the different suspicious activity that was on his computer, and that is in the appendix. There's a lot of those pages. Let's see. Appendix 15, starting at 1547 through 1628. So I get that. I mean, even if there might have been suspicious activity, there's a lot more here, isn't there? I mean, he accused or he told people that he believed the government is listening in on everyone, including himself, via government-issued cell phones. That's inaccurate. Mr. Buford testified that he said the government had the capability of doing that, not that they actually did it. I mean, but we're not here to reassess the truth of one witness versus the other. And so if that's what the government official testified, why wouldn't that be objective evidence? Because they didn't just propose, order him to take a direct examination based on that one comment. It was mostly based on the fact that he kept reporting suspicious activity, but they didn't consider the fact that he was a criminal investigator for the IRS. I mean, he accused another agency employee of hacking into his computer. It's not just isolated things. So it's a problem here that it's not just, oh, he reported that there were problems with his computer. It was the way he reported all of these that suggested that he was paranoid and that he required a medical evaluation. Don't you think somebody that thinks the government is listening in on their cell phones and is hacking into their computers, at least objective evidence sufficient for us to affirm? No, because the agency's own e-mails between their IT office indicated that there was, in fact, actually malicious content on his computer, but they never shared that information with him until later. It's in a series of e-mails between them, and that is at appendix 1631 to 1635. And I'll draw your attention to what's on 1634, where the IT people said, you know, any chance we're going to be able to determine where and when the malicious content originated from? Was the content purged, or was the system fully re-imaged? And then they subsequently issued him a new laptop. So to call somebody crazy and say, oh, yeah, there really is malicious content on his computer, let's take it off and give him another one and act like that didn't happen, that's disingenuous on the agency's part. So that there is indication that they didn't have a reasonable belief based on objective evidence that he was somehow paranoid because there was this malicious content that actually was, in fact, on his computer that the agency was aware of. And as I was saying before, he's a criminal investigator for the IRS who also works undercover, and so he has sensitive taxpayer identification information on his computer, as well as who is Larry? Mr. Buford wrote an e-mail to Larry, which is one of the things the MSPB cited on 1824. Who's Larry? Larry Arrow was his first line supervisor, Mr. Buford's first line supervisor. So Mr. Buford is accusing his supervisor. He says, I want to present you with the opportunity to liberate yourself from the fraudulent statements you've made. I know you have the ability to remotely access my computer despite your denials. You stood by SAC Pullman and constantly denied remotely access to my computer. And by the way, there's evidence in this record that nobody had access to his computer except for the IT people, as well, because the MSPB cited it. Thomas stated in a November 21, 2019 meeting at Canola that he did not authorize anyone below him to remote access the boardman's computers. You can't phone Andrew or Thomas. They're not on with the agency. This past Friday, he was the only person with the ability and motive to remove my old e-mails because you know the e-mails support my story. Why jump through all the hoops to cover up your lies? Judge Hughes asked if it wasn't possible that e-mails like this, accusing another employee who has no access to your computer, of having not only access to your computer but trying to delete e-mails which they think would support, he thinks would support his story, might be indicative of some sort of paranoia. Do you have a thought about that? I disagree. The EEO complaint is not before this court, and I'm not going to really go into any details. But that's one of the pieces of evidence rolling out by the board are his own e-mails. What the board said was many of Mr. Buford's own e-mails are the e-mails that evidenced the troubling behavior. But what I'm saying is that the behavior wasn't troubling because there was in fact malicious content on his computer. So to continue to complain about something that is in fact happening when the agency is telling you, oh, no, no, no, it's not. I can find these e-mails. Oh, yeah, it is. Jumping from possible malicious conduct to accusing your supervisor of hacking your computer and deleting e-mails is a pretty big leap. I would respectfully disagree, Your Honor, because it's not possible. But, again, we are not fact-finders. You've got to make all these arguments to the board. They found against you, and what we're looking for is substantial evidence to determine whether there was good faith. And this e-mail seems to be a piece of evidence. It seems to be one piece of evidence, but when taken in conjunction with everything else, I don't think it's enough to tip the scales. I agree with that. We're not going to relay that finding and all that. I'm sorry. Can you say that again, Your Honor? You agree that we, as an appellate court, I'm just adding on to what Judge Hughes said, is we're not going to do that finding and relay that, right? Right, right. But you are going to look to see if there's, well, you know, substantial evidence to support the judge's ruling in the case. And that's what we're looking at here. And I just want to go back to you that there was possible malicious intention. Okay. We will wait over time. We need to hear from the government, but I will restore to you the rebuttal. Okay. Thank you. Good afternoon. I may please the court. So, also, just to dive right into due process, because I think that is the main issue here, I would encourage the court to look before that testimony on pages 160 and 161 of the appendix, where earlier in it, Director Batt-Ford, Batt-Dorf, sorry, testified on page 141 that he had reviewed Buford's, Mr. Buford's written reply. It had about 170 exhibits. And then when it gets to the testimony about hundreds of pages, that actually is supported by the fact that on appendix 1314, Director Batt-Dorf received the reply, so basically the written reply from Mr. Buford from that labor relations specialist. And so as the court correctly determined, this speculation of some TIGTA report, and TIGTA is the Treasury Inspector General Tax Authority, that if they had done any kind of investigation on the computer, that gets to whether there was any malicious content for that. But that also goes to decisions that happened well before Director Batt-Dorf was considering whether to sustain the charge of failure to follow a directive. And with the due process argument, you know, again, the Norris case would control here. And that's 675x3, 1349 of this court where information known by a deciding official but not relied on does not create a due process violation. And also that a due process violation only raises concerns when the knowledge is, quote, for the deciding official's determination on either the merits of the underlying charge or the penalty taken. And here, with the allegation of the hundreds of pages and the possible TIGTA report, that isn't any material information that the deciding official testified that he relied upon. What about the second issue? Is there substantial evidence for having ordered the report? I pointed to one email that I saw on the appendix. Is there more? Yes, there is, Ron. And so that email, of course, was of concern to both the agency and the board. And that was the – so then that's page 1824 of the appendix, where that email occurred on February 2021, where despite IRS – so I think it was the special agent in charge of the Georgia Atlanta office – sitting Mr. Buford down, explaining no IT can access your computer, your direct supervisor, special agent Arrow, Larry Arrow, is not accessing your computer, that Mr. Buford continued to sincerely believe that somebody was. But other information, for example, that – as well as the testimony. So the board heard the testimony of not only Mr. Buford, and the board believed that – and this is at page 18 of the appendix, note 7 – the board believed that Mr. Buford, even as he testified, still sincerely believed that there had been surveillance and monitoring, except the board also heard the testimony of S.A. Arrow and also Dorsey, who was the recommending official for removal, as well as Director Batdorf, where they all said there is – only IT people can go in and monitor your computer. But to directly address Your Honor's question, other evidence, again, included the agency – and this is at pages 14 through 18 of the appendix – where the agency, again, had multiple discussions with Mr. Buford and explained that there was no surveillance going on. I think another key document is the management inquiry report at pages 1143 through 47 of the appendix, and this was done on February 13, 2021, so even after that email where Mr. Buford was still really concerned about things, where this was an investigation done by the Atlanta field office where they actually went in and interviewed S.A. Arrow and Dorsey and a couple others and also looked at Mr. Buford's computer and confirmed that there was no surveillance. And it's the basis of that report which led to the recommendation to do a – to recommend a medical evaluation of Mr. Buford, which then, following 5 CFR 339.301, it was only after a physical exam of Mr. Buford, basically, was cleared, that the agency then recommended – Dr. Wynn – and this is at page 1118 – then recommended a psych evaluation. And so the agency properly followed the regulations, and there was an objective belief or objective evidence before the agency that there was a real concern about Mr. Buford's possible paranoia, as Dr. Wynn identified. And again, let's keep in mind that the agency had put him on temporary restrictive duty as early as October of 2020, and he'd been making his allegations for almost a whole year prior. And Mr. Buford carried a weapon, and he had a government vehicle. And so there's objective evidence supporting the agency's concern over a nearly two-year-long period before he was ultimately removed. Do you want to make further? No, Your Honor. We've just respectfully requested the court affirm the court's decision. Thank you. Ms. Kimball, do you want to come to the podium? Your Honor, while the agency stated that they had a reasonable belief based on objective evidence that Mr. Buford wouldn't be able to perform the duty of his job, during that same year, they issued him a performance rating of exceeds fully successful, basically saying that he really did do his job even better than they expected. And so that kind of also cuts against their argument that they had this reasonable belief that, you know, they needed to have him submit to a psychiatric examination. And Mr. Arrow, his former first-line supervisor, testified that Mr. Buford's allegations did not impact his ability to perform his job at all. And in the elements of workplace interactions and workplace environment that gave him exceeds fully successful in both of those elements. So that also cuts against their argument about what they thought about his condition and his ability to perform his job. The deciding official, Mr. Batdorf, also testified that he was surprised at the allegations against – that Mr. Buford didn't have a history of failing to follow directions at all in his 18 years of working for the IRS. He only did so when he believed that the instruction was improper. The other thing I wanted to hit on before my time runs out is that removal, we believe, is beyond the maximum reasonable penalty in this case because it's outside of the agency's table of penalty. Your Honor, so you didn't address that at all in your initial argument? I didn't. I didn't remember. I remember at your brief. I don't remember at your initial oral argument. Did you raise that issue here in your oral argument? Did you raise the issue of the removal being? In my brief to the court? No, you raised it in the brief, but you can't raise in the puddle an argument that you didn't raise in your first time here because she doesn't get a chance to respond. I apologize, Your Honor. That's okay. We have the argument in the brief. Thank you. Thank you.